Theodore E. LORIA, Plaintiff–Appellee,

v.

Charles GORMAN, individually and in his capacity as a police officer for the City of Rochester, Robert Nitchman, individually and in his capacity as a police officer for the City of Rochester, Defendants–Appellants,

City of Rochester, Mark Wiater, George Markert, individually and in his capacity as a police officer for the City of Rochester, Vasquez, individually and in his capacity as a police officer for the City of Rochester, Debra Stritzel, individually and in her capacity as an employee of the City of Rochester, Defendants.

Theodore E. Loria, Plaintiff–Appellee,

v.

Dale Feor, individually and in his capacity as a police officer for the City of Rochester, Defendant–Appellant,

City of Rochester, Defendant.

Docket Nos. 01–7964, 01–7965.

United States Court of Appeals,
Second Circuit.

Argued: March 27, 2002.

Decided: Sept. 26, 2002.

Nira T. Kersmich, Rochester, NY, for Appellee.

Karen M. Kammholz, Office of the Corporation Counsel, Rochester, N.Y. (Linda S. Kingsley, Corporation Counsel, Rochester, NY, of counsel), for Appellants Gorman and Nitchman.

Michele DiGaetano, Office of the Corporation Counsel, Rochester, N.Y. (Linda S. Kingsley, Corporation Counsel, Rochester, NY, of counsel), for Appellant Feor.

Before: MESKILL, SACK and BRIGHT * Circuit Judges.

* Honorable Myron H. Bright of the United States Court of Appeals for the Eighth Circuit,

MESKILL, Circuit Judge.

These interlocutory appeals from the United States District Court for the Western District of New York, Siragusa, *J.*, arise out of plaintiff-appellee Theodore Loria's (Loria) claims of misconduct by the City of Rochester and several of its police officers. The district court granted summary judgment in favor of defendants on most of Loria's claims but denied qualified immunity to Officers Charles Gorman, Robert Nitchman and Dale Feor (collectively "appellants"), finding the existence of genuine issues of material fact. These denials are the subject of the interlocutory appeals. We deal with Loria's claim that we lack appellate jurisdiction, a claim we find unpersuasive, after setting out the facts because of their bearing on the issue.

On the merits of the appeals, we affirm in part, reverse in part and remand to the district court. We hold that the district court properly denied qualified immunity to Gorman and Feor but erred by denying it to Nitchman.

## BACKGROUND

██ "We review *de novo* the [d]istrict [c]ourt's decision to deny a government official's motion for summary judgment on the basis of qualified immunity." *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir.2002). The following facts are alleged by Loria and stipulated to by appellants unless otherwise noted.

### I. *Factual Background*

#### A. *Loria's Claims Against Appellants Gorman and Nitchman*

1. *The April 10, 1998 Arrest of Loria for Obstructing Governmental Administration*

In the early morning hours of April 10, 1998, Loria co-hosted a party for seventy to eighty people at his house, located at 15 Weaver Street in Rochester. The party was predominately held indoors with some overflow of guests onto the driveway. At approximately 1:30 a.m., two police officers arrived at 15 Weaver Street in response to a noise complaint. Loria admits that music was played at the party before the police arrived but claims that it was not loud enough to be heard outside the house.

The officers spoke with Loria's friend Joey in the driveway. Then Joey went into the house and informed Loria that officers were outside in response to a noise complaint. Loria claims that he immediately directed that the stereo be turned off and that it was not turned on again that night. Joey went back outside and informed the officers that Loria owned the house. The officers left soon thereafter.

Approximately forty-five minutes later, a different group of officers, including appellants Gorman and Nitchman, arrived at 15 Weaver Street in response to a second noise complaint. While neither Gorman nor Nitchman responded to the initial noise complaint, Gorman was aware that officers had been dispatched to 15 Weaver Street earlier that evening. Upon their arrival, Gorman and Officer Cruz approached the open side door of the house and Cruz began speaking with someone inside about the noise complaints. There was a request that the owner come outside to discuss the problem. Joey informed Loria that officers were outside and wished to speak with him regarding the noise complaints. Loria said he had nothing to say to the officers and told Joey to close the door.

When Joey refused, Loria approached the door and attempted to close it. To prevent the door from closing, Gorman stuck out his arm and leaned into the door. In so doing, he pushed the door back and

sitting by designation.

it hit Loria in the face, knocking him backwards. Gorman then took one or two steps into the foyer. Loria alleges that Gorman then grabbed him by his coat, pulled him outside and slammed him against the hood of his Jeep ripping his coat and sweater and dislocating his shoulder. Loria claims that then Gorman informed him that he was under arrest.

Loria claims that Gorman then handcuffed him and transferred him to Nitchman, who escorted him to a police car and placed him in the back seat. Loria alleges that soon after, Lieutenant Markert ordered that he be charged with obstructing governmental administration in the second degree (OGA) and Nitchman subsequently gave Loria an appearance ticket for that charge. *See* N.Y. Penal Law § 195.05. At Loria's request, Nitchman drove him to Rochester General Hospital where he received treatment for his shoulder.

With regard to the arrest, Nitchman did not see Gorman enter the house but did see him push the door and lead Loria outside. The police at the time had neither an arrest warrant nor a search warrant for the premises. The OGA charge was subsequently dismissed.

2. *The April 12, 1998 Application for and Issuance of a Warrant Based on Alleged Noise Violations*

Two days later, in the early morning hours of April 12, 1998, police received another complaint concerning loud music coming from 15 Weaver Street. Officer Nitchman responded to the complaint by going to the home of the complainant, June Irvine. In her deposition, Irvine stated that there had been exceedingly loud parties at 15 Weaver Street the previous two nights, with music so loud that it caused her house to vibrate and kept her awake. Irvine further stated that she saw "cars constantly pulling up to the front of the house, [and that] people go in and come back out within a couple of minutes" and claimed that "[t]hey may be selling drugs out of there." With regard to the night of April 12, Irvine stated that she "called again for the loud party again for ... similar things as before, very loud music and people being loud and laughing. There are cars with boom boxes going, [and] people swearing."

Loria alleges that when Nitchman arrived on the scene on April 12 at 3:10 a.m., no music was playing.[1] Nitchman did not enter the 15 Weaver Street property that morning.

In response to the same complaint, Officers Brown and Wiater responded directly to 15 Weaver Street and saw a number of people, one of whom Wiater believed was Loria, enter the house and close the door as the police pulled up. Wiater approached the closed door, knocked, and asked Loria to come outside. Someone inside, whom Wiater thought was Loria based on his voice, yelled for the police to leave. Wiater testified that he recognized Loria's voice because he had spoken with him earlier that evening.

Wiater subsequently told Nitchman that Loria was at the party and Nitchman filed a warrant application charging Loria with a violation of a city noise ordinance. In that application, Nitchman asserted, *inter alia*, that he had personal knowledge that music was audible beyond the property

---

1. Loria's denial that music was playing when Nitchman arrived is inconsistent with both his claim that he was not present at 15 Weaver Street at the time and Nitchman's deposition testimony that he heard music playing. Despite this inconsistency, we accept Loria's version of the facts on this issue for purposes of this appeal. *See infra.* Consequently, we will assume both that Loria was not present and that music was not playing when Nitchman arrived.

line, that Loria owned the property, was present at the party on April 12 and refused to answer the door for the police during an investigation of vice activity. A copy of Irvine's deposition was attached. Nitchman did not state in the application that the information regarding Loria's presence and refusal to open the door was based solely on his conversation with Wiater rather than his own perception. Nor did Nitchman attribute his claim that music was playing to the Irvine deposition.

A city court judge signed the warrant and an appearance ticket was issued to Loria for the noise violation. The charge was subsequently dismissed.

### B. *Loria's Claims Against Appellant Feor*

#### 1. *The April 17, 1997 Collision Involving Loria*

On the evening of April 17, 1997, Loria was driving his Jeep when it collided with and damaged a Dodge Neon, owned by Annie Mosley, the mother of Loria's former girlfriend Latrelle Mosley (Mosley). Mosley was not in the car when the vehicles collided, but a friend who was in the car at the time informed her of the incident and of Loria's involvement.

Mosley later called the police and Officer Hernandez investigated the incident and completed a report. Hernandez gave Mosley a copy of the report.

#### 2. *The April 18, 1997 Incident Involving Loria and Loria's Subsequent Arrest*

On April 18, 1997, Loria and Mosley encountered each other at a gas station. Loria jumped out of his van and confronted Mosley, yelling violently. A loud and profane argument ensued during which Loria told Mosley that he would kill her. Responding to a call, two police officers arrived, separated Loria and Mosley, arrested Loria for harassment and placed him in a police car.

About twenty minutes later, Inspector Feor arrived at the gas station. He spoke with Mosley who showed him her copy of the crime investigation report Hernandez had completed regarding the previous night's collision. The report classified the offenses Mosley alleged Loria had committed as criminal mischief and reckless endangerment. In addition, Mosley claims that she told Feor that the collision was with Loria's Jeep as opposed to his van.

Feor examined both Mosley's Neon and Loria's van, which were at the scene, and concluded that it was possible that the damage to the Neon had been caused by a collision with the van. Feor then charged Loria with criminal mischief in the third degree (a felony), reckless endangerment in the second degree, aggravated unlicensed operation of a motor vehicle and harassment in the second degree. He subsequently obtained from Mosley a supporting deposition in which she claimed that Loria followed her to the gas station and threatened to kill her. The second paragraph of the deposition was blank when Mosley signed it and Feor later filled it in, adding that Loria had hit the Neon with the van and caused over five hundred dollars in damage. The penultimate line of the deposition states "[a]t no time did I give [Loria] permission to damage my car or threaten me or try to hurt me while I was in my car." At some point during the incident, Feor said to Loria: "Hey Teddy, remember me scumbag? ... Guess what? Today is your lucky day. I am going to charge you with a felony for smashing her car last night." The charges against Loria were subsequently dismissed.

### II. *Procedural History*

In April 1998, Loria filed a complaint in the United States District Court for the

Western District of New York against the City and Feor alleging, based on the April 18, 1997 arrest, that Feor was liable for false arrest, false imprisonment and malicious prosecution under both state and federal law and that his unlawful actions were done pursuant to a City policy or had been ratified by the City.

Four months later, Loria filed a complaint naming, among others, the City, Gorman and Nitchman, alleging that the defendants had violated Loria's civil rights during a series of incidents. Specifically, Loria claimed, *inter alia,* that the April 10, 1998 arrest in his home was made "without probable cause, justification and/or a warrant" and that therefore Gorman, Wiater and Nitchman had violated Loria's Fourth Amendment rights and state and federal prohibitions against false arrest and false imprisonment. Loria also claimed that Gorman used excessive force in effecting the arrest in violation of both state and federal law. Loria further alleged that Nitchman provided false information about the noise violation of April 12 in support of the arrest warrant application and was therefore liable for malicious prosecution under both state and federal law.

Following discovery in both cases, defendants moved for summary judgment and Loria cross-moved. In the first case, against the City and Feor, the district court granted summary judgment in favor of the City and denied Loria's cross-motion. The court also denied summary judgment to Feor in part, holding that Loria's false arrest and false imprisonment claims arising out of the arrest for criminal mischief and reckless endangerment could not be dismissed because "a factual dispute exists with regard to [which copy of the] police report Feor had before him" and what other information Mosley gave Feor at the scene.

In the second case, involving Gorman and Nitchman, the district court denied

Loria's cross-motion and granted summary judgment in favor of defendants on all of Loria's claims except those against Gorman and Nitchman arising out of the events of April 10 and 12 of 1998. With regard to the April 10 arrest of Loria for OGA, the court concluded that a material factual dispute existed regarding whether loud music was playing when the police arrived to investigate the second complaint. The court reasoned that if there was no music playing when the police arrived, the investigation was unauthorized and Loria could not properly be arrested for obstructing it.

As to Loria's claims arising out of the April 12 warrant application, the court concluded that summary judgment on qualified immunity grounds could not be granted in Nitchman's favor because "a question of fact exists as to whether [Loria] was present at 15 Weaver Street in the early morning hours of April 12, 1998, such that Officer Wiater could have heard him through the door and relayed that information to Defendant Nitchman." In the court's view, if Loria was not present, Nitchman would not have had a sufficient basis to charge him with a noise violation and could not obtain the benefit of qualified immunity.

After filing timely notices of appeal, appellants moved for stays pending appeal of that court's decisions. The district court treated those motions as requesting both a stay pending appeal and reconsideration and proceeded to address anew appellants' entitlement to qualified immunity. In so doing, it held that Feor was entitled to qualified immunity from Loria's federal claims based on the harassment arrest because the arrest was supported by probable cause and therefore could not form the basis for a 42 U.S.C. § 1983 claim even if it violated state law. The court reaffirmed its denial of qualified

immunity to appellants from Loria's other claims, however, and also denied their requests for stays pending appeal.[2]

## DISCUSSION

### I. *Appellate Jurisdiction*

At the outset, we must address Loria's claim that we lack jurisdiction to hear this appeal because the district court held that material issues of fact exist and appellants have not effectively agreed to be bound by Loria's version of the facts. Although orders denying summary judgment generally are not immediately appealable, an exception exists where the defendant asserts a defense of qualified immunity that raises purely legal, rather than factual, issues. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526–28, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, even if the district court finds that material issues of fact exist, " 'we may still exercise interlocutory jurisdiction if the defendant ... contends that he is entitled to qualified immunity even under plaintiff's version of the facts.' " *Coons v. Casabella*, 284 F.3d 437, 440 (2d Cir.2002) (quoting *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir.1998)); *see Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir.1995) ("[I]n the absence of a material factual dispute, the question of whether it was objectively reasonable for the officers to believe that they did not violate the

plaintiff's rights is a purely legal determination for the court to make.").

Loria concedes that for purposes of this appeal appellants have, at least nominally, conceded the questions of fact, contending that they are entitled to qualified immunity under Loria's version of events. He argues, however, that we lack jurisdiction despite that stipulation because appellants' presentation of the facts remains at odds with his in certain respects. In Loria's view, those disparities render appellants' agreement to be bound by his version of the facts ineffective for jurisdictional purposes. We are unpersuaded.

The critical issue is whether the interlocutory appeal raises purely legal issues. Once a defendant asserting qualified immunity has agreed to be bound by the plaintiff's version of the facts, the issues become purely legal and we have jurisdiction over an interlocutory appeal from a denial of immunity. *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). If there were attempts by appellants to evade their agreement by spinning the facts in their favor it would not change the legal nature of the issues raised here. We are bound by the constraints of our jurisdiction to decide this appeal based on the version of the facts before the district court that is most favorable to Loria. Therefore, where appellants' factual contentions contradict Loria's, we will ignore them.[3]

**2.** The district court's orders denying appellants' motions for stays pending appeal are included in the joint appendix but not in the record on appeal. Ordinarily, material not included in the record on appeal will not be considered. *See Petitions of Rudder*, 159 F.2d 695, 696 (2d Cir.1947) ("Since the material printed in the appendices has not been incorporated into the records on appeal, we shall not consider it in determining the merits of the appeals."). However, given the nature of the material and the absence of any objection, we believe that it may properly be considered in this case. *See id.* (noting that no successful objection could be made to the inclusion in

the record of official papers of the district court).

**3.** Loria makes a number of dubious assertions on appeal. Most notably, he claims that Gorman was aware that Loria was the owner of the house at 15 Weaver Street at the time of the arrest despite having stipulated below that "Gorman *did not know* on April 10, 1998, whether [Loria] was the owner of 15 Weaver Street." (emphasis added). None of those assertions is material to our analysis, however, and we need not determine if we are bound to accept them for purposes of these appeals. *Cf. Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773

## II. *Overview of Qualified Immunity*

 Qualified immunity strikes a balance between the need to provide a means for the vindication of constitutional guarantees and the societal costs that inhere in litigation against public officials, including "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949)); *see Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). It does so by "shield[ing them] from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe,* 282 F.3d at 132; *see Elder,* 510 U.S. at 512, 114 S.Ct. 1019. Qualified immunity is more than a simple defense—it is "an entitlement not to stand trial or face the other burdens of litigation, . . . an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806. As a result, the Supreme Court has made clear that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

 We conduct a two part inquiry to determine if an official is entitled to qualified immunity. The threshold question is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Addressing this initial question serves the important role of providing a clear standard against which officers can measure the legality of future conduct. *See id.; see also County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that "if the policy of avoidance [of determining constitutional issues] were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals"). Thus, although we have under certain circumstances bypassed this first step and proceeded directly to the qualified immunity inquiry, that is the exception rather than the rule. *See Koch v. Town of Brattleboro,* 287 F.3d 162, 166 (2d Cir.2002) (declining to address the threshold inquiry where the issue was likely to arise in context of a suppression motion).

 If we determine that the officer's conduct did not violate a constitutional right, we proceed no further and hold that the officer is entitled to qualified immunity. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. However, if we decide otherwise, we proceed to "ask whether the right was clearly established" at the time it was allegedly infringed. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151;

---

(1996) (holding that court of appeals may be required to review the record to determine what facts the district court likely assumed).

see *Hope v. Pelzer*, —— U.S. ——, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) ("[T]he salient question . . . is whether the state of the law [at the time of the challenged conduct] gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.").

 Said differently, if the officer's conduct violated a right, we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions. *See Poe*, 282 F.3d at 133. If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken. *See id.; see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). However, if his belief was not objectively reasonable, qualified immunity offers him no solace and the plaintiff's claims must be allowed to proceed. *See Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727.

III. *Appellants' Claims of Qualified Immunity*

A. *Qualified Immunity from Claims Arising out of the April 10, 1998 Arrest of Loria for OGA*

1. *Gorman's Entitlement to Qualified Immunity*

Loria's complaint alleges that Gorman's actions on April 10, 1998 constituted an "unlawful arrest" that was "at his home" and that violated the "Fourth, Fifth, and Fourteenth Amendments." We construe these claims as being for common-law false arrest and for an unconstitutional search and seizure. In response, Gorman asserted qualified immunity as a defense and sought summary judgment on that basis.

The district court denied Gorman's motion for summary judgment, holding that a genuine issue of fact existed as to whether music was playing when Gorman arrived to investigate the second noise complaint. In the court's view, the issue of fact was material because the presence of loud music provided the sole justification for Gorman's investigation. The court reasoned that if there was no music Gorman's investigation was unlawful and any attempt by Loria to impede it could not properly support an arrest for OGA under New York law. *See Lennon*, 66 F.3d at 424 (noting that, under New York law, the official function obstructed must be authorized by law for the defendant to be guilty of OGA).

We disagree with the district court's reasoning and hold that summary judgment should have been granted in Gorman's favor with regard to Loria's claims of false arrest and false imprisonment. However, we affirm the district court's denial of qualified immunity to Gorman from Loria's Fourth Amendment claims to the extent those claims arise out of Gorman's warrantless entry into Loria's home and warrantless seizure. Thus, we affirm the order of the district court in part and reverse in part.

a. *Loria's Fourth and Sixth Causes of Action Alleging Fourth Amendment Violations, False Arrest and False Imprisonment*

As an initial matter, we believe the district court erred in denying Gorman's motion for summary judgment with regard to these claims based on the factual dispute as to whether music was playing when the police arrived to investigate the second noise complaint. Although there was indeed a factual dispute on the issue, it was not material and therefore cannot preclude a grant of summary judgment. *See* Fed. R.Civ.P. 56(c) (providing, *inter alia*, that

summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact"); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that a material fact is one that "might affect the outcome of the suit under the governing law" and that "[f]actual disputes that are irrelevant or unnecessary" cannot defeat a motion for summary judgment).

■ It is undisputed that, during the early morning hours of April 10, the police had received two noise complaints within an hour concerning the 15 Weaver Street property. Even if the music was off when the officers arrived they could lawfully investigate the successive noise complaints. *Cf. Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir.1997) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." (quotation marks omitted)). Therefore, the presence or absence of music on their arrival is immaterial and the district court erred in denying summary judgment on that basis. Consequently, we hold that the police were engaged in an authorized official function when they arrived at 15 Weaver Street to investigate

the second loud noise complaint. *See Lennon*, 66 F.3d at 424.[4]

■ Our inquiry is far from over, however. We now address the more difficult question of whether Gorman's acts of invading Loria's house without a warrant and seizing Loria inside preclude him from obtaining qualified immunity from Loria's Fourth Amendment claims.[5] We believe they do.

■ The Supreme Court recently reiterated the firmly established rule that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, —— U.S. ——, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002) (per curiam) (referencing *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)); *see Minnesota v. Carter*, 525 U.S. 83, 100, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, *J.*, concurring); *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir.1991) ("There can be no doubt that it was established prior to November 1986 that the Fourth Amendment guarantees an individual the right to be secure against forcible entry of his home save in exceptional circumstances and that seizures inside a home without a warrant are presumptively unreasonable." (citations and quotation marks omitted)). Therefore, Gorman's entry into Loria's home and sei-

---

4. Loria does not explicitly argue in his appellate brief that, assuming the investigation was lawful, the events Gorman witnessed were insufficient to establish probable cause for the OGA arrest. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir.2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quotation marks omitted)). Therefore, we assume for purposes of this appeal that because the investigation was lawful the OGA arrest was made with probable cause.

5. The district court did not reach the issue of whether Gorman was entitled to qualified immunity from Loria's claims arising out of Gorman's entry of Loria's house and subsequent seizure of Loria inside. Although we ordinarily do not address issues not passed on below, judicial economy warrants our doing so here to prevent unnecessary delay in deciding whether Gorman is entitled to qualified immunity. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418–19 (2d Cir.2001); *see also Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (stressing the importance of deciding qualified immunity questions at the earliest possible stage in the litigation).

zure of him without a warrant violated a constitutional right unless justified by exigent circumstances.

■ As the Supreme Court held in *Payton*, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 590, 100 S.Ct. 1371. Subsequent holdings have reiterated that principle and "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much" to be tolerated. *Kyllo v. United States*, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). We believe it is clear that by stepping into the house, Gorman crossed *Payton*'s "firm line" and implicated its protections. No invasion of the sanctity of the home can be dismissed as *de minimis*. " 'A sane, decent, civilized society must provide some ... oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.' " *Silverman*, 365 U.S. at 511 n. 4, 81 S.Ct. 679 (quoting *United States v. On Lee*, 193 F.2d 306, 315–16 (2d Cir.1951) (Frank, *J.*, dissenting)); *see Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038 ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the non-intimate rug on the vestibule floor.").

Our next step is to determine if exigent circumstances were present that justified Gorman's entry into Loria's home. Gorman testified that at the time of the arrest no one was in danger and no "emergency situation" existed. He claimed, however, that he "believed that given the late hour and the complaints by the neighbors for the noise disturbances exigent circumstances existed which would allow [him] to take the one or two steps into the doorway to stop the door from slamming and to take custody of Mr. Loria."

■ We use the following factors as guides to determine whether exigent circumstances justifying a warrantless entry are present:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Fields*, 113 F.3d 313, 323 (2d Cir.1997) (quoting *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (in banc)). These factors are "intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account." *MacDonald*, 916 F.2d at 770. Thus, the presence or absence of any single factor is not dispositive.

■ Ultimately, "[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Id.* at 769 (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir.1970) (in banc)). In answering that question, we must be cognizant of the Supreme Court's admonition that "exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732

(1984) (quotation marks and citation omitted).

 The first factor—the gravity or violent nature of the offense—weighs heavily in the determination of whether exigent circumstances exist. *See id.* at 752, 104 S.Ct. 2091 (describing the gravity of the offense as an "important part" of the inquiry). Indeed, the Supreme Court has noted "that it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Id.* at 753, 104 S.Ct. 2091. The offense for which Loria was arrested, OGA, is a Class A misdemeanor punishable by up to one year in jail. *See* N.Y. Penal Law § 195.05 (classifying OGA as a Class A misdemeanor); *see also* N.Y. Penal Law § 70.15(1) (providing that a sentence of imprisonment for a Class A misdemeanor "shall not exceed one year"). Thus, it is arguably more severe than the offense at issue in *Welsh*, driving while intoxicated, for which no imprisonment was possible under Wisconsin law. *See id.* at 754, 104 S.Ct. 2091; *see also Illinois v. McArthur*, 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (reiterating that the penalty attached to an offense provides the clearest indication of the gravity of the offense).

Under these circumstances, however, we do not believe the offense of OGA is sufficiently grave or violent to provide the police with reason to ignore the warrant requirement. The crime for which Gorman arrested Loria did not create a risk of serious injury. Gorman himself conceded that no one was in danger and that no emergency existed at the time of the arrest. In addition, the underlying offense that Gorman was investigating—the violation of the City of Rochester noise ordinance—was punishable by only a twenty-five dollar fine and therefore qualifies as "extremely minor." *See Welsh*, 466 U.S.

at 753, 104 S.Ct. 2091; *see also* Rochester City Code, §§ 75–12 (proscribing noise), 75–16 (referencing penalties), 13A–11 (providing for a $25.00 penalty for the first violation). It would be hard to justify a holding that attempting to close a door in order to impede an investigation into an offense punishable by only a small fine constitutes a "grave or violent" offense, even if the obstruction itself is theoretically jailable. *Cf. Nigro v. Phillips*, 1997 WL 86323 at *12 (N.D.N.Y.1997) (concluding that the "grave or violent offense" factor weighed against a finding of exigent circumstances where crime "defendants claim they had probable cause to believe was occurring . . . [wa]s only a class A misdemeanor."). Therefore, we conclude that the first factor weighs heavily against a finding of exigent circumstances.

Along similar lines, the second factor—whether the suspect is reasonably believed to be armed—counsels against a finding of exigent circumstances. There is no indication that weapons were present at the scene of the arrest. The sixth factor—the peaceful circumstances of the entry—also militates against such a finding. Loria alleges that Gorman pushed the door into his face with sufficient force to knock him backwards. That use of physical force was sufficient to render the entry non-peaceful for purposes of this analysis. *See United States v. Harris*, 435 F.2d 74, 82 n. 13 (D.C.Cir.1970) (noting that "the entry here was 'peaceful' in the sense that no physical force was used, and as such would tend to support police entry without warrant in exigent circumstances").

 The remaining factors do not tilt strongly in favor of finding exigent circumstances. We hold as a matter of law that exigent circumstances were not present when Gorman entered the house to arrest Loria. Although the existence of probable cause and knowledge that the

suspect is on the premises are important predicates to a finding that an entry was justified based on exigent circumstances, they are not sufficient to justify an entry where the crime involved is minor and there is no apparent potential for violence. *See Welsh,* 466 U.S. at 753, 104 S.Ct. 2091 (noting that exigent circumstances do not exist "simply because there is probable cause to believe that a serious crime has been committed"). As the Supreme Court has noted, "application of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Id.; see Kyllo,* 533 U.S. at 31, 121 S.Ct. 2038 ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."). Furthermore, the state's interest in preventing any likelihood of escape is significantly lessened where the offense involved is minor and poses no danger to the community. Consequently, Gorman's entry into the house and seizure of Loria inside were not justified by exigent circumstances and therefore violated the Constitution.

■ Having found a violation of a constitutional right, we consider whether that right was clearly established, "that is, whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Poe,* 282 F.3d at 132 (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). The question is whether circumstances were present in this case that would have made it objectively reasonable for Gorman to believe that stepping into Loria's house and seizing him did not violate the law.

We conclude that no such circumstances were present. We note as an initial matter that *Payton* clearly established that both "searches *and* seizures inside a home

without a warrant are presumptively unreasonable." 445 U.S. at 586, 100 S.Ct. 1371 (emphasis added). Taking the facts as alleged by Loria before the district court, as we are required to do, Loria was not in the doorway. Rather, he was at least a door's width inside the house when he attempted to close the door. *Cf. Payton,* 445 U.S. at 589, 100 S.Ct. 1371 (noting that nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home"); *United States v. Gori,* 230 F.3d 44, 60–61 (2d Cir.2000), *cert. denied,* — U.S. —, 122 S.Ct. 62, 151 L.Ed.2d 29 (2001) (Sotomayor, J., dissenting) ("*Payton* did not draw the line one or two feet into the home; it *drew the line at the home's entrance."* (quotation marks omitted) (emphasis in *Gori* )).

At no point was Loria "as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house." *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Indeed, he was attempting to limit his exposure to public view when he was arrested. *Cf. United States v. Crespo,* 834 F.2d 267, 270 (2d Cir.1987) (holding *Santana* inapplicable where door was opened half way in response to coercion by DEA agents and arrestee was not exposed to public view as if outside). Therefore, we hold that under the circumstances no reasonable officer could have concluded that—simply because Loria was near the door—taking two steps into the house and seizing Loria inside did not constitute a Fourth Amendment entry. *See United States v. Reed,* 572 F.2d 412, 422–23 (2d Cir.1978) (holding *Santana* inapplicable because arrestee, who had just opened door, was behind the threshold and was not exposed to public view as if outside). *But cf. Sparing v. Vill. of Olympia Fields,* 266 F.3d 684, 691 (7th Cir.2001), *cert. denied,* — U.S. —, 122 S.Ct. 2660,

153 L.Ed.2d 835 (2002) (concluding "that the law surrounding Fourth Amendment 'doorway arrest' questions ... was not sufficiently settled or defined at the time of the arrest to defeat qualified immunity"); *Joyce v. Town of Tewksbury,* 112 F.3d 19, 22 (1st Cir.1997) (in banc) (per curiam) (same).

■ Our next step is to determine whether it was objectively reasonable for Gorman to believe that exigent circumstances justified his entry and arrest. We have already held as a matter of law that such circumstances were not present at the time of the arrest. Gorman is entitled to qualified immunity, however, if reasonable officers could disagree as to whether exigent circumstances were present. *See Koch,* 287 F.3d at 169 (holding that a grant of summary judgment based on qualified immunity "was appropriate because the officers reasonably believed that exigent circumstances justified their entry"). We conclude that no reasonable officer could have found that exigent circumstances were present at the time of the arrest. The noise violation underlying the offense was minor and there was no threat of violence. Consequently, we hold that Gorman is not entitled to qualified immunity from Loria's claims arising out of the entry into his home and the seizure of Loria inside.

■ We also conclude that Loria's arrest inside his home, in addition to constituting an unconstitutional seizure, was proximately caused by the unconstitutional search of his home that occurred when Gorman entered it without a warrant. In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court explained that the purpose of § 1983 is to adopt to the constitutional context "the common law of torts [which] has developed a set of rules to implement the principle that a person should be compensated fairly for injuries *caused* by the vio-

lation of his legal rights." *Id.* at 257, 98 S.Ct. 1042 (emphasis added). Since *Carey,* this Court has held that "in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998). Gorman's entry into Loria's home was a proximate cause of the arrest, particularly because it is clear on these facts that Loria did not intend to submit to arrest outside of the house.

Therefore, we hold that Gorman is not entitled to qualified immunity from Loria's fourth and sixth causes of action to the extent they raise claims arising out of the entry into Loria's home and arrest of Loria inside.

### b. *Loria's First and Second Causes of Action Alleging the Use of Excessive Force and Assault and Battery*

The district court, without any independent analysis, denied Gorman qualified immunity from Loria's first and second causes of action alleging that Gorman subjected Loria to excessive force in violation of both state and federal law and committed assault and battery under state law. Gorman makes no argument on appeal challenging this denial. Because Gorman abandoned this claim, we will move on to the next issue.

### 2. *Nitchman's Entitlement to Qualified Immunity*

■ The district court, again without independent analysis, also denied qualified immunity to Nitchman from both Loria's Fourth Amendment claims and his state and federal claims of false arrest and false imprisonment. We reverse the denial of summary judgment on the false arrest and false imprisonment claims based on our holding that, for purposes of this appeal, probable cause existed at the time of the

arrest. *See Singer v. Fulton County Sheriff,* 63 .F.3d 110, 118–19 (2d Cir.1995). Because there was probable cause, Nitchman is entitled to summary judgment on Loria's claims to the extent they are based on his issuance to Loria of an appearance ticket for OGA. *See id.* The question remains, however, whether Nitchman was entitled to summary judgment on Loria's Fourth Amendment claims arising out of his arrest by Gorman on April 10.

We conclude that he was. Nitchman testified that he did not enter the house and did not see Gorman enter the house. He stated that he only witnessed Loria attempting to close the door on Gorman and Cruz and saw Gorman leading Loria out of the house moments later. Loria does not dispute this, and apparently bases his claims against Nitchman on his actions after Gorman transferred Loria to Nitchman following the arrest.

 We see no basis for liability on these facts. We accept Nitchman's uncontradicted testimony that he did not witness any unlawful activity and simply accepted Loria from Gorman. *See Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir. 2001) (noting that "the direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal"). Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful. *See Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000). Therefore, Nitchman is entitled to summary judgment on all of Loria's claims arising out of the OGA arrest.

**B.** *Nitchman's Entitlement to Qualified Immunity from Claims Arising out of the April 12, 1998 Application for and Issuance of a Warrant for Noise Violations*

Loria's tenth and eleventh causes of action sound in malicious prosecution under state and federal law. According to Loria, Nitchman maliciously filed a warrant application that falsely indicated that he had personal knowledge that Loria was present at 15 Weaver Street on the night of April 12, 1998 and that music being played there was audible beyond the property line.[6] Nitchman sought qualified immunity from Loria's claims and moved for summary judgment, asserting that he was entitled to rely on the statements of witnesses and his fellow officers to support a finding of probable cause. The district court denied the motion, holding that even though Nitchman "arguably had probable cause to believe Loria was guilty of violating the City anti-noise ordinance" despite any inaccurate statements, he was not entitled to summary judgment because "a question of fact exists as to whether [Loria] was present ... such that Officer Wiater could have heard him through the door and relayed that information to Defendant Nitchman."

 Nitchman's motion should have been granted. As an initial matter, we note that the issue of fact on which the district court relied is immaterial to the disposition of Loria's claims against Nitchman. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Whether or not Loria was in fact present is irrelevant to the determination of whether Nitchman had probable cause; probable cause is an assessment of probabilities, not an ascertainment of

---

**6.** As noted, Nitchman testified that he personally heard music audible from beyond the property line when he arrived to investigate the complaint. For purposes of this appeal, however, we accept Loria's claim that no music was playing at the time the officers arrived.

truths. *See, e. g., Lee,* 136 F.3d at 103 (noting that an officer may rely on a complaint to establish probable cause and cannot be held liable for a constitutional violation simply because the complaint turns out to have been false); *cf. Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Therefore, the district court erred in holding that the dispute regarding whether Loria was at 15 Weaver Street precluded the granting of summary judgment in Nitchman's favor.

■ Loria's malicious prosecution claim falters on the first step of the qualified immunity analysis because he has failed to demonstrate that "construing the facts most favorably to the plaintiff, 'the facts alleged show the officer's conduct violated a constitutional right.'" *Poe,* 282 F.3d at 132 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). The right Loria alleges was violated "can be particularized as the right to be free from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause." *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999) (quotation marks omitted). To allege a violation of that clearly established right, Loria must demonstrate both that Nitchman intentionally or recklessly made false statements in the warrant application and that those statements were necessary to a finding of probable cause. *See id.*[7]

■ Even if Nitchman falsely stated that the allegations in the warrant application were based on his personal knowledge, Loria's claim fails because those statements were not necessary to a finding of probable cause. *See id.* We assess the materiality of alleged misstate-ments in a warrant application by "put[ting] aside allegedly false material, supply[ing] any omitted information, and then determin[ing] whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Martinez v. City of Schenectady,* 115 F.3d 111, 115 (2d Cir.1997) (quotation marks omitted). If the corrected affidavit would be sufficient to support probable cause as a matter of law, no constitutional right was violated and the defendant officer is entitled to summary judgment. *See id.; see also Smith,* 175 F.3d at 105.

Taking Loria's allegations as true, the sole misstatement in the warrant application was Nitchman's assertion that he had personal knowledge of the allegations in the application. Therefore, the corrected affidavit would state that Nitchman had been informed by Irvine, an identified citizen witness, that music had come from Loria's property during the early morning hours that was audible beyond Loria's property line and that he had been informed by a fellow officer that Loria was present on the property. *See Martinez,* 115 F.3d at 115.

That corrected affidavit would be sufficient as a matter of law to support probable cause. The noise ordinance at issue provides, *inter alia,* that "[n]o person shall use or operate or permit to be used or operated any ... device for the producing ... of sound with louder volume than is necessary for convenient hearing" and that if the sound is "[a]udible beyond the property line ... between the hours of 10:00 p.m. and 8:00 a.m." that is *prima facie* evidence of a violation. Rochester City Code, § 75–12. For purposes of the probable cause determination, Nitchman was

---

7. Loria makes a vague argument, without citing any authority, that had Nitchman averred that his statements were based on information and belief rather than his own personal knowledge, the warrant application could not properly have been granted even if there was probable cause. We deem this argument waived. *See Tolbert,* 242 F.3d at 75.

entitled to rely on Irvine's deposition in which she states that the music—played during the early morning hours—was so loud that she could feel the vibrations while in her own home. *See Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir.2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." (citation omitted)). Furthermore, Nitchman could rely on Wiater's statement that Loria was present that evening. *See Simonetti,* 202 F.3d at 634 (noting that officers are entitled to rely on the statements of other officers in determining whether probable cause is present); *see also United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.").

Loria has not alleged that Nitchman was aware of any information that would cast doubt on the veracity of either of the statements. *See Curley,* 268 F.3d at 70. Thus, the statements by Irvine and Wiater supplied Nitchman with reasonably trustworthy information sufficient to support a finding of probable cause to believe that Loria violated the noise ordinance. Therefore, the alleged misstatements in the warrant application are immaterial and no constitutional right was violated. We hold that Nitchman is entitled to qualified immunity and reverse that part of the order of the district court.

### C. *Feor's Entitlement to Qualified Immunity from Claims Arising out of His April 18, 1997 Arrest of Loria*

Loria's complaint against Feor alleged state and federal claims of false arrest, false imprisonment and malicious prosecution arising out of Feor's April 18, 1997 arrest of Loria. In response, Feor asserted that his actions were supported by probable cause and, alternatively, that he was entitled to qualified immunity. Feor subsequently sought summary judgment on those bases. The district court granted his motion in part but ultimately denied it with regard to a number of Loria's claims.[8]

This appeal addresses the district court's denial of qualified immunity to Feor from Loria's claims arising out of the arrest for reckless endangerment and criminal mischief. The district court held that the factual dispute as to what information was available to Feor at the time of the arrest precluded summary judgment on those claims. In the court's view, if Feor had only the version of Hernandez's report that did not contain a description of the suspect vehicle or a narrative "relative to the manner in which Loria allegedly used his car to intentionally strike Mosley's," he would have to rely on Mosley's statements to reasonably find probable cause to arrest. Because the content of those statements is disputed, the court held that a material issue of fact exists and summary judgment could not be granted. We agree with the district court's conclu-

---

**8.** The district court initially denied summary judgment to Feor from Loria's claims, both state and federal, arising out of the arrest for harassment in the second degree but subsequently granted Feor's motion as to the federal claim. The court, however, explicitly "noted, and defendant conceded at oral argument, that Loria's state cause of action, with virtually similar elements, may still go forward on the harassment arrest." Although Loria's state claim remains viable, Feor states on appeal that the district court granted him qualified immunity for the harassment arrest and makes no argument on the remaining state claim. Therefore, we will not address the validity of the district court's denial of Feor's motion for summary judgment as to that claim. *See United States v. Gabriel,* 125 F.3d 89, 100 n. 6 (2d Cir.1997) (holding argument not raised in initial brief waived).

sion, but arrive there by different reasoning.

As noted, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope,* 122 S.Ct. at 2513. *But see Coons,* 284 F.3d at 442 (declining to decide if actual probable cause was present where officer was entitled to qualified immunity based on arguable probable cause). It is firmly established that, if proven, Loria's claims of arrest and prosecution without probable cause implicate constitutional rights. *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."). Thus, the dispositive issue for purposes of the first part of the qualified immunity inquiry is whether, based on the facts as alleged by Loria, Feor's actions were based on probable cause.

 We hold that they were not. "[P]robable cause is a fluid concept" and the assessment of whether it exists is shaped by the factual context of the case. *See Gates,* 462 U.S. at 232, 103 S.Ct. 2317. Under the circumstances presented in this case, we believe that to have probable cause to arrest or prosecute Loria for reckless endangerment in the second degree or criminal mischief in the third degree, Feor would have to possess sufficient information to support a reasonable belief that Loria recklessly or intentionally collided with Mosley's car. *See* N.Y. Penal Law §§ 120.20 ("A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."), 145.05 ("A person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, ... he damages property of another person in an amount exceeding two hundred fifty dollars."). We conclude as a matter of law that the information Feor had was insufficient to establish probable cause.

At the time of the arrest, Feor's sole sources of information were Mosley's statements, a visual inspection of the vehicles at the scene and the copy of Hernandez's report regarding the previous night's collision. These sources, taken together, do not provide sufficient information to support a reasonable conclusion that the collision was more than a simple traffic accident. *Cf. United States v. Bonds,* 422 F.2d 660, 665 (8th Cir.1970) ("The mere fact that a person is shot does not support an inference that the shooting was intentional and unlawful."). Therefore, Feor lacked probable cause to charge Loria with either reckless endangerment in the second degree or criminal mischief in the third degree.

Mosley claims that she told Feor only that her car was damaged by Loria's Jeep. There is no indication in her affidavit or deposition testimony that she told Feor prior to the arrest that Loria had recklessly or intentionally hit her car. Indeed, Feor does not argue to the contrary. In his affidavit, Feor asserts only that Mosley told him that Loria "hit her vehicle." Thus, Mosley's verbal statements prior to the arrest provided Feor with insufficient information to find probable cause to arrest for either reckless endangerment or criminal mischief.

Nor can Feor rely on the supporting deposition that Mosley signed stating, *inter alia,* that "[a]t no time did I give [Loria] permission to damage my car or threaten me or try to hurt me while I was in my car." The source of that statement is in dispute. Mosley's affidavit casts doubt on whether that sentence was in the supporting deposition when she signed it or was subsequently added by Feor. Be-

cause we are bound to construe the facts in the light most favorable to Loria, we assume the latter. Furthermore, even if the sentence was present when Mosley signed the deposition, Feor testified that the deposition was obtained after Loria's arrest. Therefore, its contents are irrelevant to the determination of whether Feor had probable cause to arrest. *See Lowth v. Town of Cheektowaga,* 82 F.3d 563, 567 (2d Cir.1996) ("[F]or the purposes of the qualified immunity analysis, we consider only those facts that were actually available to the police officers, or could reasonably have been perceived by them, at the moment they engaged in the challenged conduct.").[9]

Given the lack of any support for an inference of intent from the information supplied by Mosley, Feor must rely on Hernandez's classification, in the crime investigation report completed the night before the arrest, of the offenses alleged by Mosley as "Crim Mis" and "Reckless Endanger." According to Feor, those notations provided sufficient evidence of intent to support a finding of probable cause to arrest Loria for reckless endangerment and criminal mischief.

▇▇▇ An officer may arrest an individual based on a report by another officer only if reliance on that report is objectively reasonable. *See United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). According to Feor, only the offense classification, victim information and suspect information were completed on the signed copy of Hernandez's report. There was no narrative of events.

Nor was there a specification of what degrees of criminal mischief and reckless endangerment Hernandez found that Mosley had alleged. Indeed, the report gave no indication that Hernandez himself believed he had probable cause to arrest Loria; it simply indicated that Mosley alleged facts that fell within a certain category of offenses.

Feor's reliance on Hernandez's report to arrest Loria for criminal mischief in the third degree was objectively unreasonable. As noted, Feor alleges that the copy of the report he had seen at the time of the arrest included the notations "Crim Mis" and "Reckless Endanger" and did not include Hernandez's estimate of the amount of damage to Mosley's car. That information provides no indication that Loria struck Mosley's car "with [the] intent to damage property of another person" necessary to render him liable for criminal mischief in the third degree. N.Y. Penal Law § 145.05. Hernandez's report did not indicate the degree of criminal mischief alleged, and an individual can be liable for criminal mischief in the fourth degree if he "[r]ecklessly damages the property of another person in an amount exceeding two hundred fifty dollars." N.Y. Penal Law § 145.00. Thus, Feor's decision to arrest Loria for criminal mischief in the third degree, which requires intent, could not properly be based on the broad classification of "Crim Mis" in Hernandez's report.

By contrast, Hernandez's notation of "Reckless Endanger" necessarily implies that the conduct alleged by Mosley could

---

**9.** Although our discussion of probable cause is phrased in terms of probable cause to arrest rather than probable cause to prosecute, our analysis applies equally to both Loria's false arrest or false imprisonment and malicious prosecution claims. *See Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir.1999) (noting that in malicious prosecution context probable cause focuses on belief that charge could be successfully prosecuted). At this stage, we are required to construe the facts in Loria's favor. Therefore, we express no view as to whether Feor would have had probable cause to prosecute if the penultimate sentence of Mosley's deposition, taken after the arrest, had been complete when Mosley signed.

be classified as reckless. Even so, we do not believe that Feor's reliance on the copy of Hernandez's report to arrest Loria for reckless endangerment in the second degree was objectively reasonable. The copy of the report Feor had was incomplete. It gave no indication that Hernandez believed he had probable cause to arrest or instructions that Loria be arrested. The portion of the report indicating the decision made by Hernandez was blank. From Feor's perspective, it was possible that Hernandez had concluded that Mosley's claims were unfounded and warranted no further action. The report gave Feor no basis to believe otherwise.

Furthermore, Mosley, the putative victim of the alleged crimes at issue, was readily available for questioning. Feor questioned her at length about Loria's conduct, but not about whether Mosley believed Loria intentionally caused the collision and, if so, her basis for that belief. *See BeVier v. Hucal,* 806 F.2d 123, 127 (7th Cir.1986) (finding that officer lacked probable cause to arrest where he unreasonably failed to question individuals at the scene and noting that "probable cause is a function of information and exigency"). Indeed, Feor failed to ask Mosley if she was in the car when the April 17 collision occurred. Thus, Feor lacked probable cause, arguable or otherwise, to arrest Loria for either criminal mischief in the third degree or reckless endangerment in the second degree and the district court properly denied him qualified immunity.

## CONCLUSION

For the foregoing reasons, we affirm the orders of the district court in part, reverse in part and remand for further proceedings.