OPINION OF THE COURT
Francesca E. Connolly, J.
On December 2, 2010, at 5:30 a.m., the City of Mount Vernon Emergency Services Unit (hereinafter ESU) executed a “no-knock” search warrant on the plaintiffs’ apartment. The warrant was obtained from a Mount Vernon City Court judge based upon information supplied by a confidential informant. At the time the warrant was executed, the plaintiff Diana Edwards, *437 the two-year-old plaintiff Trystan Edwards, and nonparty Orey Warren were sleeping in a rear bedroom. The ESU team broke down the plaintiffs’ front door, detonated a “flash-bang” grenade inside the apartment, and stormed the residence clad in body armor, helmets, and carrying semiautomatic rifles. The members of ESU entered the rear bedroom and handcuffed Diana Edwards and Warren.
After ESU secured the apartment, Detective Edward McCue, who had applied for and obtained the search warrant, entered the apartment and almost immediately realized that something was wrong. Instead of finding a cluttered apartment strewn with empty alcohol bottles, ashtrays, and marihuana—as the confidential informant had indicated they would find—the police encountered a “relatively neat” residence. The contraband that was the subject of the search warrant was not in the apartment and the occupants of the apartment were not the persons who were the subjects of the criminal investigation. Indeed, there is no evidence that the plaintiffs or Warren were in any way connected with the person under suspicion of criminal activity, who was the intended target of the raid.
Accordingly, the plaintiffs commenced this action to recover damages for injuries they allegedly sustained as a result of the incident. The defendant City of Mount Vernon moves for summary judgment dismissing the complaint.
Factual Background/Procedural History
The Pleadings
The plaintiffs commenced this action on or about July 13, 2011 against the City, asserting causes of action for negligence and negligent hiring, training, supervision, and retention of law enforcement officers on behalf of both plaintiffs, and causes of action for false arrest and loss of services on behalf of the plaintiff Diana Edwards. The City answered the complaint asserting various affirmative defenses, including justification, probable cause, and absolute and qualified immunity.
The City’s Motion for Summary Judgment
In support of its motion, the City relies upon, among other things, the plaintiffs’ notice of claim, a copy of the search warrant, copies of police incident reports, Diana Edwards’ General Municipal Law § 50-h hearing transcript, and deposition transcripts of Detective Edward McCue, Lieutenant Glenn Scott, and Diana Edwards.
According to Edwards’ deposition and 50-h hearing, on September 1, 2010—three months before the incident in ques *438 tion—she moved into the subject two-bedroom apartment, with her two-year-old son Trystan, located at 70 West 3rd Street, apartment 7J, Mount Vernon. Edwards was a full-time student at Westchester Community College and a 23-year resident of Mount Vernon. In the early morning hours of December 2, 2010, the plaintiffs and Orey Warren, who is Trystan’s father, were sleeping in the rear bedroom of the apartment. Edwards heard three loud bangs on the front door that sounded like gunshots. Warren and Edwards got out of bed and went into the living room where she observed the front door burst open and smoke bombs being thrown into the living room. Men with guns and masks rushed into the apartment yelling, “Police. Put your hands up.” Edwards ran to the rear bedroom to protect her son. When she saw that the men were in fact the police, she put her hands up, and the officers began searching for their identification. Edwards and Warren, who were both naked, were allowed to dress. They were then handcuffed and brought into the living room. A female officer stayed with Trystan in the rear bedroom. Additional officers arrived. Edwards remained in the living room in handcuffs while she watched the police “ransack” the apartment (Edwards 50-h hearing tr at 14). The officers looked through kitchen cabinets, pulled out drawers, rummaged through Trystan’s toys, moved the beds and dressers, knocked items off the dressers onto the floor, and damaged the sheetrock near the closet. The officers asked Edwards if she knew a person named N.K., whose name appeared on the warrant.[1] Edwards had seen the person who she believed was N.K. in the apartment building, but had never met him. After 20 to 30 minutes had passed, an officer wearing a suit and tie told her: “This was a mistake. We didn’t mean to come in here and disturb a family. We got a call or we got a tip that the person who we were looking for lived here” (Edwards deposition at 37). After apologizing, the police left. Edwards contacted her landlord to have the front door fixed and, although the lock was fixed about a month later, the door remained damaged. Edwards also sought counseling from a neighborhood health center for herself and her son.
The day after the incident, a woman claiming to be N.K.’s mother came to her door and apologized, telling Edwards that her son no longer lived with her in the building.
The search warrant, issued by a Mount Vernon City Court judge on December 1, 2010, permitted a search of the apart *439 ment, at any time, for: pistols, holsters, ammunition, drugs, and any documents belonging to N.K. Further, the warrant permitted the officers to execute the search warrant without first announcing their purpose or authority (i.e., a “no-knock” warrant).
The warrant application was supported by the affidavit of Detective Edward McCue, who averred that he was investigating the crimes of criminal possession of a weapon in the second degree and criminal possession of a controlled substance in the third degree. McCue’s affidavit states:
“This Court conducted an in-camera review of a named individual with the initials D.R. The Court was able to inquire and ask questions of this named individual. D.R. provided information that on Saturday November 27, 2010 he was hanging out with an individual he knows as ‘Gusto’ who he believes has a first name [N.]. Gusto is a male black, approximately 27 years old (D.R. then identified ‘Gusto’ from a photo of [N.K.]. . . . Your deponent was present when the identification procedure was done). The Mount Vernon Police Department Records Database indicate [sic] the following: ‘Gusto is the alias for [N.K.] . . . and that [NK] has been arrested for Criminal Possession of a Weapon and Criminal Possession of a Controlled Substance in the past.’ “Thereafter, D.R. advised this Court that ‘Gusto’ was carrying a dark colored backpack which contained a Mack 10 automatic firearm. D.R. advised that Gusto showed him the firearm in the street and that they then went to 70 West 3rd Street, Apt. J. He advised that the outside of the building is noted with a large 70 on the building and that said building is a brick building. They took the elevator up to the 7th floor, exited and entered the door to the immediate left and entered apartment 7J. Said apartment is clearly marked.
“Once inside said apartment D.R. and Gusto went inside and into the kitchen area. Once there Gusto took the Mack 10 firearm out of the backpack and again showed it to D.R. Thereafter, Gusto produced a second firearm, believed to be a .380 firearm. Gusto then took the firearms and retreated to the back room. When Gusto returned to the kitchen, he was no longer in possession of said firearms.
“D.R. also indicated to this Court that he has previ *440 ously been inside said location with Gusto and Gusto’s brother [name omitted]. He advised this Court that he knows that Gusto lives there with his brother and grandmother. . . .
“Moreover, your deponent has confirmed through the Mount Vernon Police Database that [N.K.] resides at 70 West 3rd Street, Apartment 7J. Moreover your deponent confirmed that 70 West 3rd Street is a brick building and has the number 70 clearly visual on its exterior. There is an elevator inside the building and apartment 7J is located on the immediate left upon exiting said elevator. Your deponent was present during the time where D.R. identified a person your deponent knows as [N.K.] as Gusto. This was confirmed with a photo identification by D.R. of Gusto. Your deponent is aware that [N.K.] has a brother named [name omitted].” (Defendant’s exhibit I.)
Detective Edward McCue testified at his deposition that he was a member of the Intelligence Unit of the Mount Vernon Police Department. He had been conducting an ongoing investigation into N.K., a well-known drug dealer. According to police department records, approximately two to three years prior to the underlying incident, a search warrant had been executed at the same property for weapons and narcotics. The process of obtaining the subject search warrant began after Detective McCue received information from a confidential informant that individuals, including a person known to be N.K., resided in the subject apartment and were in possession of illegal weapons and narcotics.
Detective McCue did not recall whether the informant had provided any information in the past or whether the informant received any consideration in exchange for the information. Further, Detective McCue did not speak to the landlord of the subject building about whether N.K. resided in the apartment and he did not recall whether he reviewed utility records to verify the informant’s information. Detective McCue did not view the names on the mailboxes in the apartment building to corroborate the informant, nor was any surveillance of the apartment conducted prior to obtaining the warrant.
Detective McCue was aware that on March 31, 2010 N.K. was arrested by Mount Vernon police officers and charged with criminal possession of a gravity knife and resisting arrest. On the incident report, N.K.’s address was listed as 218 Washington *441 Street, Mount Vernon—a different address than the plaintiffs’ apartment (see defendant’s exhibit M). A separate police incident report for a trespassing incident on September 13, 2010 also listed 218 Washington Street as N.K.’s address (see defendant’s exhibit N). Detective McCue considered the existence of the second address to be “irrelevant,” as N.K. had, in McCue’s mind, clearly used multiple addresses interchangeably (McCue deposition at 110). Police records also indicated that two to three years prior to the subject incident, a search warrant had been issued for the subject apartment—long before the plaintiffs moved in—and N.K. had been arrested there with a firearm.
Detective McCue further testified that the confidential informant was examined in camera by a Mount Vernon City Court judge, who issued a warrant for the search of the subject apartment. The in camera session with the informant was steno-graphically recorded. Detective McCue’s warrant affidavit states that “[a] transcript of that proceeding has been requested” (defendant’s exhibit I at 6), however, Detective McCue did not recall personally receiving a copy of the transcript (McCue deposition at 24-27).
On December 2, 2010, the warrant was executed. ESU made initial entry into the apartment and called the apartment “clear” after the occupants had been handcuffed. When Detective McCue subsequently entered the apartment, he realized that the people and items he was searching for were not in the apartment:
“I’m going to say that I realized it all at once, but I walked in the door, and there was something of a nice living room setup there, and it wasn’t what our informant had told [us] was supposed to be there. And as soon as I looked in there, it was like something’s wrong. It didn’t occur to me all at once.” (McCue deposition at 63.)
The apartment was not—as the informant had predicted—filled with “empty alcoholic beverage vessels, ashtrays, weed, . . . [and] cigarettes” (id.). The adult occupants of the apartment were uncuffed after approximately five minutes and, although the apartment was searched for individuals, “[w]e didn’t start pulling draw[ers] open and going through their personal effects” (id. at 66).
Lieutenant Glen Scott testified that in 2010 he was a sergeant in the Intelligence Unit. Lieutenant Scott was familiar with *442 N.K., a person of interest, who had an extensive record and was known to be a low-level drug dealer and who was being investigated in connection with possession of guns and drugs. Lieutenant Scott participated in the execution of the search warrant, acting in a dual capacity as supervisor of the Intelligence Unit and on behalf of ESU. In conducting the search, ESU carried semiautomatic rifles and one of the officers had a flash diversionary device known as a “flash-bang” grenade (Scott deposition at 34). The ESU officers entered the apartment by forced entry and tossed the flash diversionary device inside. When Lieutenant Scott entered, he observed a “relatively neat” apartment and three occupants: a male, a female, and a child (Scott deposition at 69). The officers who entered before him had already placed the occupants in handcuffs. Lieutenant Scott interviewed Edwards and Warren. After conducting a quick search, no evidence of weapons or drugs was found.
In support of its motion, the City argues that the plaintiffs’ claim for false arrest should be dismissed as a matter of law because the officers had probable cause and acted pursuant to a duly authorized search warrant to enter the premises and detain the occupants during the search. Further, the City argues that the brief detention of Diana Edwards was privileged. The City contends that the plaintiffs’ claim for negligent hiring, training, supervision, and retention of the officers should be dismissed on the ground that there is no evidence that the City acted with deliberate indifference in hiring the officers involved in the underlying incident or that it failed to supervise or train the department’s officers. Finally, the City further contends that the plaintiffs’ causes of action denominated as claims for “personal injury” are, to the best of the City’s understanding, causes of action sounding in intentional or negligent infliction of emotional distress. The City argues that the conduct of its officers was lawful and did not rise to the level of extreme or outrageous conduct.
The Plaintiffs’ Opposition
The plaintiffs contend that Detective McCue omitted material information from the warrant application. Specifically, the plaintiffs argue that Detective McCue should have disclosed that police records from three months and eight months prior to the subject incident showed that N.K. resided at 218 Washington Street. With respect to their causes of action for negligent hiring and retention, the plaintiffs indicate that they have no objection to the dismissal of those counts “[s]ince De *443 fendant obviously agrees that they are vicariously liable for the actions of the officers who conducted the search” (affirmation in opposition ¶ 19).
The City’s Reply
In reply, the City contends that the plaintiffs have not disputed the fact that N.K. lived in the apartment at a previous time. Additionally, the City contends that McCue’s actions and inactions were consistent with police practices, and that his decision not to ask the landlord whether N.K. resided in the building was an exercise of caution based on departmental experience in executing “no-knock” warrants. Further, the City contends that the plaintiffs’ allegation that Detective McCue intentionally omitted N.K.’s alternate address when securing the search warrant is unfounded.
Legal Analysis/Discussion
I. Qualified Immunity
The City failed to meet its prima facie burden for summary judgment, as its own motion papers raise issues of fact as to whether it is entitled to qualified immunity in connection with the entry into the plaintiffs’ home and the detention of the plaintiff Diana Edwards (see Gyokchyan v City of New York, 106 AD3d 780, 781-782 [2d Dept 2013] [summary judgment should be denied where movant’s own papers raise triable issues of fact]).
“Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause” (Walczyk v Rio, 496 F3d 139, 155-156 [2d Cir 2007]).[2]
“A plaintiff can demonstrate that her right not to be searched absent a search warrant supported by probable cause was violated where the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause” (McColley v County of Rensselaer, *444 740 F3d 817, 823 [2d Cir 2014] [internal quotation marks omitted]).
Thus, a plaintiff may overcome a search warrant’s presumption of reasonableness by: (1) establishing that the warrant application, on its face, fails to establish probable cause (i.e., a facial challenge), or (2) by establishing that the warrant applicant made false statements or material omissions, either knowingly and intentionally or with reckless disregard for the truth (see Walczyk v Rio, 496 F3d at 156).
A. The court cannot determine whether the warrant was facially valid from this record.
With respect to the facial validity of the warrant, the record is not sufficiently complete to permit the court to examine whether the Mount Vernon City Court was presented with information constituting probable cause for the issuance of the warrant (see Walczyk v Rio, 496 F3d at 157 [noting that, in a civil action challenging the facial validity of a search warrant, “a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate”]). In addition to Detective McCue’s affidavit, the Mount Vernon City Court conducted an in camera interview with the confidential informant, which was transcribed, but the transcript has not been produced in support of the motion. New York adheres to the Aguilar-Spinelli test, which requires “a reasonable showing that the informant was reliable and had a basis of knowledge for the statement” (People v Hetrick, 80 NY2d 344, 348 [1992]). “A warrant application containing information provided by a confidential informant must demonstrate the veracity or reliability of the source of the information” (People v Chisholm, 21 NY3d 990, 992 [2013] [internal quotation marks omitted]).
The City’s argument, in reply, that the plaintiff should have come forward with the confidential informant’s sworn testimony (see reply ¶ 27) improperly attempts to shift the burden to the plaintiff. To the contrary, on a motion for summary judgment it is the movant who bears the burden of eliminating triable issues of fact (see Englington Med., P.C. v Motor Veh. Acc. Indem. Corp., 81 AD3d 223, 230 [2d Dept 2011] [“(The defendant) misconstrues the burden applicable to the parties, which is a fundamental aspect of a motion for summary judgment. As the movant, (the defendant) must first come forward with admissible evidence demonstrating, prima facie, the absence of material issues of fact and that, on those facts, it is or would be entitled to judgment as a matter of law”]). Moreover, the City *445 bears the burden of establishing its defense of qualified immunity based upon the existence of probable cause (see Director General of Railroads v Kastenbaum, 263 US 25, 27 [1923] [in an action for false imprisonment “the burden is on the defendant to establish probable cause for the arrest”]).
Accordingly, to the extent the City argues that the warrant application, on its face, affords it immunity, it has failed to meet its prima facie burden for summary judgment (cf. Walczyk v Rio, 496 F3d at 157 [“In this case, there can be no dispute as to what facts the defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits. Thus, whether the affidavits, on their face, demonstrate probable cause, is a question of law”]).
B. There is an issue of fact regarding the omission of material information.
Turning to the issue of whether material information was omitted from the warrant application—which is the plaintiffs’ primary argument in opposition to the motion—on a motion for summary judgment the court’s role is limited as follows:
“The materiality of a misrepresentation or an omission in [a warrant application] is a mixed question of law and fact. The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases.” (Velardi v Walsh, 40 F3d 569, 574 [1994] [citations omitted]; see McColley v County of Rensselaer, 740 F3d at 823.)
“In determining whether omitted information was necessary to the finding of probable cause, we look to the hypothetical contents of a ‘corrected’ application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law” (McColley v County of Rensselaer, 740 F3d at 823 [internal quotation marks omitted]).
“In performing the ‘corrected affidavit’ analysis, ‘we examine all of the information the officers possessed when they applied for the arrest warrant’ ” (id., quoting Escalera v Lunn, 361 F3d 737, 744 [2d Cir 2004]). “[T]he law does not demand that an officer applying for a warrant ‘volunteer every fact that arguably *446 cuts against the existence of probable cause,’ as long as he does ‘not omit circumstances that are critical’ to its evaluation” (Walczyk v Rio, 496 F3d at 161, quoting Brown v D’Amico, 35 F3d 97, 99 [2d Cir 1994]).
Here, Detective McCue’s affidavit omitted information he possessed that N.K. resided at a different address than the plaintiffs’ address. Notably, two recent Mount Vernon Police Department incident reports from March 2010 and September 2010—eight months and three months prior to the search— listed N.K.’s address as 218 Washington Street (defendant’s exhibits M, N). However, Detective McCue omitted this information and stated in his affidavit in support of the search warrant: “[Y]our deponent has confirmed through the Mount Vernon Police Database that [N.K.] resides at 70 West 3rd Street, Apartment 7J” (defendant’s exhibit I).
Other than the information provided by the confidential informant, the only other concrete information that Detective McCue possessed connecting N.K. to the apartment was that a search warrant had been executed at 70 West 3rd Street, Apartment 7J “two or three” years prior to the warrant application (see McCue deposition at 14-16). While the fact that N.K. had a connection to this very apartment was relevant, “[i]n evaluating probable cause, a magistrate is always required to consider whether the facts adduced in the warrant application appear to be current, i.e., true at the time of the application, or whether they have become stale” (Walczyk v Rio, 496 F3d at 162 [internal quotation marks omitted] [denying summary judgment on the ground of qualified immunity where a supporting affidavit for a search warrant to search the suspect’s parent’s home omitted that the suspect “had not resided at his mother’s 27 Tunxis Street residence for more than seven years. . . . (W)here information is seven years old, a magistrate must be alerted to that fact to make a reasonable probable cause determination”]).
This omitted information was indeed relevant to the probable cause determination, particularly given that the primary information supporting the warrant application was provided by a confidential informant (see McColley v County of Rensselaer, 740 F3d at 824 [“where a warrant affidavit is based upon information provided by a confidential informant, any omissions become all the more glaring because any material omission necessarily alters the ‘totality of the circumstances’ upon which the confidential information is to be assessed”]).
*447 McCue’s subjective belief that the 218 Washington Street address was “irrelevant” to the warrant application is not a defense to this action, as an officer’s good faith belief has no bearing on the issue of probable cause:
“The want of probable cause ... is measured by the state of the defendant’s knowledge, not by his intent. . . . [T]he standard applied to defendant’s consciousness is external to it. The question is not whether he thought the facts to constitute probable cause, but whether the court thinks they did. Probable cause is a mixed question of law and fact. The court submits the evidence of it to the jury, with instructions as to what facts will amount to probable cause if proved.” (Director General of Railroads v Kastenbaum, 263 US 25, 27-28 [1923] [“good faith is not enough to constitute probable cause”].)
As materiality is a mixed question of law and fact, the weight that a neutral magistrate would have given the omitted information is a question for the factfinder at the time of trial (see Velardi v Walsh, 40 F3d 569, 574 [1994]). Accordingly, the branch of the City’s motion which is for summary judgment on the ground of qualified immunity is denied.
C. Issues of fact exist regarding the officers’ conduct after realizing a mistake had occurred.
Moreover, even assuming that the warrant would have been issued had the application contained the omitted information, the record raises issues of fact as to whether the officers unreasonably prolonged the search of the apartment and Edwards’ detention after it became apparent that the warrant was issued upon incorrect information. “[A]ny search or seizure that occurred while the officers were under the mistaken but reasonable belief that they were in fact executing the warrant at the correct residence would be protected by qualified immunity. Conversely, any search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity” (Pray v City of Sandusky, 49 F3d 1154, 1159 [6th Cir 1995], citing Castro v United States, 34 F3d 106 [2d Cir 1994]; see Closure v Onondaga County, 2007 WL 446595, *5, 2007 US Dist LEXIS 8947, **14 [ND NY 2007] [“The threshold issue in an action such as this, where officers mistakenly executed a no-knock search warrant on the wrong residence, is whether the officers immediately withdrew upon the realization that they were in the wrong home”]).
*448 Here, although Detective McCue testified that Edwards was uncuffed and the search was curtailed within five minutes, Edwards testified that she remained handcuffed for up to 30 minutes while the officers ransacked the apartment, pulling out drawers, opening cabinets, and moving furniture. These contrasting versions of events raise issues of fact regarding the reasonableness of the officers’ actions once it became apparent that a mistake had been made (see Delgado v City of New York, 86 AD3d 502, 510 [1st Dept 2011] [“Upon entering the apartment, the police encountered not ‘Green Eyes’ and ‘Shorty’ with an infant, as described by the informant, but plaintiff mother and her six sleeping children. At that point, a reasonable police officer should have realized that an error had been made”]).
II. Negligent Hiring and Retention
As the plaintiffs do not object to the dismissal of the second and sixth causes of action alleging negligent hiring and retention, the City is entitled to summary judgment dismissing those causes of action. In any event, summary judgment dismissing the negligent hiring and retention claims is warranted, on the merits, as it is undisputed that the police were acting within the scope of their employment at all relevant times (see Karoon v New York City Tr. Auth., 241 AD 2d 323, 324 [1st Dept 1997] [“where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee’s negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention”]).
III. The Plaintiffs’ Remaining Claims
Finally, the City contends that the plaintiffs’ remaining causes of action—denominated as claims for “personal injuries” and loss of services—should be dismissed. The City characterizes these causes of action as sounding in intentional or negligent infliction of emotional distress, and makes specific arguments regarding these theories of recovery.
However, the court reads the complaint differently, as alleging a cause of action sounding in negligence, not intentional or negligent infliction of emotional distress. Accordingly, the City’s arguments regarding intentional and negligent infliction of emotional distress are misplaced, as they are addressed to causes *449 of action the plaintiffs have not pleaded.[3] Accordingly, the City has failed to meet its prima facie burden for summary judgment dismissing the plaintiffs’ remaining causes of action (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]), and those branches of the City’s motion are denied without regard to the plaintiffs’ opposition papers (see Stukas v Streiter, 83 AD3d 18, 24 [2d Dept 2011] [“to defeat summary judgment, the nonmoving party need only raise a triable issue of fact with respect to the element of the cause of action or theory of nonliability that is the subject of the moving party’s prima facie showing”]).
Based upon the foregoing, it is hereby ordered that the defendant’s motion for summary judgment is granted to the extent of dismissing the plaintiffs’ second and sixth causes of action alleging negligent hiring and retention, and the motion is otherwise denied; and it is further ordered that all other relief requested and not decided herein is denied.

. The court will use the initials of the suspect throughout this decision instead of his full name, as the criminal allegations against him have not, to the court’s knowledge, been proven.

. Here, the complaint raises only state law claims. However, the court notes that probable cause is a complete defense to both state and federal causes of action alleging unlawful search or false imprisonment (see Rodgers v City of New York, 106 AD3d 1068, 1069 [2d Dept 2013] [“Probable cause to believe that a person committed a crime is a complete defense to an action alleging false arrest or false imprisonment, whether brought under state law or 42 USC § 1983”]; see also Walczyk v Rio, 496 F3d at 155 [evaluating the legality of searches pursuant to warrants under both federal and state law]).

. In any event, addressing the City’s arguments, while the court agrees that “[p]ublic policy bars claims for intentional infliction of emotional distress against a governmental entity,” there is no such public policy bar for causes of action sounding in negligent infliction of emotional distress (Liranzo v New York City Health & Hosps. Corp., 300 AD2d 548, 548 [2d Dept 2002]; see Rodgers v City of New York, 106 AD3d 1068, 1070 [2d Dept 2013]). Other than the public policy bar, the only argument raised by the City is that the conduct of the officers did not rise to the level of extreme or outrageous conduct. However, viewing the evidence in the light most favorable to the plaintiffs (see Pearson v Dix McBride, LLC, 63 AD3d 895, 895 [2d Dept 2009] [“in determining a motion for summary judgment, evidence must be viewed in the light most favorable to the nonmovant”]), the court cannot say that breaking down a family’s front door at 5:30 a.m., detonating a flash-bang grenade in their home, and storming the residence does not rise to the level of outrageous conduct, as a matter of law. However, the court reiterates its view that the plaintiffs have not pleaded or even attempted to plead causes of action for intentional or negligent infliction of emotional distress. While not raised by the City, the court notes that to the extent the plaintiffs seek damages in connection with Edwards’ alleged false arrest and detention, she “may not recover under broad general principles of negligence” and is limited to “the traditional remedies of false arrest and imprisonment” (Johnson v Kings County Dist. Attorney’s Off., 308 AD2d 278, 285 [2d Dept 2003]; see Ray v County of Nassau, 100 AD3d 854, 854 [2d Dept 2012]).